# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: May 1, 2023

```
*  *  *  *  *  *  *  *  *  *  *  *  *
COYT M. KARRIKER,                  *          Unpublished
                                   *
           Petitioner,             *          No. 19-227V
                                   *
v.                                 *          Special Master Gowen
                                   *
SECRETARY OF HEALTH                *          Finding of Fact; Table Guillain
AND HUMAN SERVICES,                *          Barré Syndrome ("GBS"); Influenza;
                                   *          Onset.
           Respondent.             *
*  *  *  *  *  *  *  *  *  *  *  *  *
```

*Nancy R. Meyers,* Turning Point Litigation, Greensboro, NC, for petitioner.
*Christine M. Becer,* U.S. Dept. of Justice, Washington, D.C., for respondent.

## FINDING OF FACT[1]

On February 8, 2019, Coyt M. Karriker ("petitioner") filed a petition in the National Vaccine Injury Compensation Program.[2]  Petitioner alleges that as a result of receiving an influenza ("flu") vaccination on October 10, 2017, he suffered Guillain-Barré Syndrome ("GBS"), with an onset of symptoms within three days, constituting an injury listed on the Vaccine Injury Table.  Petition (ECF No. 1).  For the reasons I discuss below, I find that the onset of petitioner's GBS began within three days of vaccination.

### I.    Procedural History

Petitioner filed medical records to accompany his petition.  Petitioner ("Pet.") Exhibits ("Exs.") 1-12.  For the next year, petitioner filed additional medical records requested by respondent to evaluate his claim.  Pet. Exs. 13-17 (ECF Nos. 14, 19, 26).

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this decision contains a reasoned explanation for the action in this case, I am required to post it to a publicly available website.  This decision will appear at https://www.govinfo.gov/app/collection/uscourts/national/cofc or on the Court of Federal Claims website. **This means the decision will be available to anyone with access to the Internet.**  Before the decision is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b).  "An objecting party must provide the court with a proposed redacted version of the decision." *Id.*  **If neither party files a motion for redaction within 14 days, the decision will be posted on the court's website without any changes.**  *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act").  Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

On July 28, 2020, respondent filed the Rule 4(c) Report recommending against compensation. Respondent ("Resp.") ("Rept.") (ECF No. 32).  Respondent asserted three main reasons that petitioner has not demonstrated a Table Injury of GBS: 1) petitioner had an ear infection prior to receiving the flu vaccine; 2) the onset of petitioner's symptoms occurred one day after vaccination, outside the temporal association provided in the Vaccine Table; and 3) petitioner does not meet the QAI for GBS.  Resp. Rept. at 7.

After a status conference with the Special Processing Unit ("SPU") staff attorney, Chief Special Master Corcoran issued an Order to Show Cause as to why petitioner's Table GBS case should not be dismissed.  Order to Show Cause (ECF No. 33).

On October 28, 2020, petitioner filed a response to the Order to Show Cause.  Pet. Response (ECF No. 35).  Petitioner stated that "the fact that petitioner suffered from otitis media prior to his vaccination does not make him ineligible to assert a Table Claim." Pet. Response at 4.  Additionally, petitioner stated that "it is respondent's burden to prove an alternate cause" and that respondent must prove the alternative cause by preponderant evidence.  *Id.* at 2, 8.  Then petitioner asserted that the records demonstrate that his GBS symptoms began three days post-vaccination and that the medical records cited to by respondent conflate his right shoulder injury that occurred a week prior to vaccination with the onset of his GBS symptoms.  *Id.* at 9.  Finally, petitioner asserts that his symptoms do meet the QAI's definition for Acute Inflammatory Demyelinating Polyneuropathy ("AIDP") because the records demonstrate that his symptoms of bilateral flaccid limb weakness and decreased or absent deep tendon reflexes began on the right side but progressed to bilateral symptoms.  *Id.* at 11.

Respondent filed a response to petitioner's response to the Order to Show Cause on November 12, 2020.  Resp. Reply (ECF No. 36).  Respondent stated that he "maintains his position that petitioner has not demonstrated that he is entitled to compensation based on a Table presumption of GBS." Resp. Reply at 1.  Specifically, respondent stated that "petitioner's symptoms of his alleged GBS began the same day as his vaccination on October 10, 2017." *Id.*  Additionally, respondent maintained that petitioner did not meet the QAI definition for GBS and that petitioner's post-vaccination symptoms "fluctuated widely" and that petitioner "did not have bilateral flaccid paralysis." *Id.* at 3.

On April 2, 2021, Chief Special Master Corcoran issued a Reassignment Order, which explained that "further development of the record is required." Reassignment Order (ECF No. 38).  The order also explains that "the onset of petitioner's alleged GBS is very closely intertwined with the onset of a separate shoulder injury experienced around the time of vaccination.  Petitioner has persuasively argued that at least some symptoms he experienced in October 2017 may have been related to a right shoulder injury he experienced after a [knee] scooter accident on October 6, 2017.  Accordingly, shoulder pain symptoms that seemed incompatible with the Table onset requirements may in fact be distinguishable from his actual GBS onset." *Id.* at 2.  However, Chief Special Master Corcoran also observed that one day after the vaccination at issue, petitioner's chiropractor recorded that petitioner had "numbness in his arm and hand." *Id.*; *see also* Pet. Ex. 5 at 4-5.  Given the factual complications of this case and the need for further consideration of the onset of petitioner's symptoms, this case was reassigned to the undersigned's docket.

The undersigned held a status conference on April 28, 2021.  I reviewed the medical records and the responses of the parties to the Order to Show Cause.  I explained that it appeared that "there was a confluence of issues," relating to petitioner's right shoulder injury caused by a kneeling scooter incident

prior to the vaccination and the onset of his GBS symptoms. Scheduling Order (ECF no. 41). I also explained that petitioner's treating medical providers diagnosed him with GBS. *Id.* I recommended that petitioner file an expert report to distinguish the symptoms of his right shoulder pain that could be associated with the identifiable torn infraspinatus tendon and the symptoms associated with GBS. *Id.* On March 11, 2022, petitioner filed an expert report from Dr. Lawrence Steinman. Pet. Ex. 19 (ECF No. 44). Respondent filed an expert report from Dr. Thomas Leist. Resp. Ex. A (ECF No. 47).

I held another status conference on December 20, 2022. During the status conference, respondent's counsel explained that the onset of petitioner's symptoms was the main issue in this case. Scheduling Order (ECF No. 49). I did note that the medical history recorded in the medical records did have some inconsistencies, but that the parties should consider litigative risk settlement. *Id.* at 3. The parties were unable to resolve the case and requested a fact hearing to determine the onset of petitioner's GBS symptoms. *See* Resp. Status Rept. (ECF No. 51).

Petitioner filed affidavits from his two children and his ex-wife on March 15, 2023. A fact hearing was held on March 23, 2023, where the petitioner testified.

This matter is now ripe for adjudication.

## II.     Evidence Submitted

### a.  Medical records relevant to onset

Prior to petitioner's October 10, 2017 flu vaccination, he had been being treated for poorly controlled type 2 diabetes. Pet. Ex. 1 at 116. On January 4, 2017, petitioner had an appointment with his primary care physician, Dr. Robert Levy, where it was recorded that petitioner had a "left foot ulcer that started in the spring of 2016 after he suffered a fifth metatarsal fracture of the left foot." *Id.* Dr. Levy wrote petitioner's ulcer had been slow to heal because of serial casting. *Id.* Petitioner was diagnosed with "diabetic foot infection." *Id.* His appointments with Dr. Levy from January 2017 until October 10, 2017 focused on sick visits and checking his diabetes. *See generally* Pet. Ex. 1.

Petitioner also had periodically been treated at Burgess Chiropractic Clinic in 2015, 2016 and 2017. Pet. Ex. 5. For example, on April 21, 2016, petitioner sought treatment for pain in his lower back with sciatica. *Id.* at 5. It was recorded that petitioner had just gotten out of a boot "which he wore for eight weeks due to a left broken foot." *Id.* On April 22, 2016, petitioner had another appointment where it was recorded that he had "some improve[ment]," but that petitioner was "stiff in the lower back (AC)." *Id.*

On October 10, 2017, petitioner had an appointment with Dr. Levy. Pet. Ex. 1 at 216. Dr. Levy recorded that petitioner continued to use a boot or removable cast on his left foot because of his diabetic ulcer. *Id.* At this appointment, petitioner reported some jaw and ear pain, but denied fever or drainage. *Id.* Petitioner stated that he had taken some left over antibiotics, which resolved these symptoms. *Id.* After an examination, Dr. Levy diagnosed petitioner with otitis media and wrote petitioner a prescription of amoxicillin. *Id.* at 219. Petitioner was also administered the flu vaccine in his left deltoid at that appointment. *Id.* at 223.

On Wednesday, October 11, 2017, petitioner went to Burgess Chiropractor Clinic with complaints of "right shoulder pain since 10/10/2017, as well as, numbness in his arm and hand (AC) and soreness of the low back." Pet. Ex. 5 at 5. Petitioner returned the following day, on Thursday, October 12, 2017. *Id.* It was recorded that petitioner had "pain and limited arm motion in right shoulder and arm today." *Id.*

The same day, October 12, 2017, petitioner had an appointment at OrthoCarolina, an orthopedic urgent care center, for "right shoulder and neck pain." Pet. Ex. 4 at 2. The History of Present Illness provides:

> Patient states he was riding on his…scooter when he hit a rock this past Friday night and the scooter jerked his right shoulder and immediately felt pain and discomfort. Patient states he initially seemed okay however the pain and discomfort has progressively worsened to the point where he can no longer lift his arm up.

*Id.* The physical examination of his right shoulder revealed "tenderness to palpation over the lateral aspect of the shoulder near the supraspinatus insertion." *Id.* Petitioner had mild discomfort over the AC joint and had "zero active range of motion." *Id.* Petitioner had passive range of motion of 130 degrees until he expressed discomfort. *Id.* Additionally, he had positive drop-arm. *Id.* Petitioner was diagnosed with "right shoulder pain; right shoulder rotator cuff possible tear," and an MRI of his right shoulder was ordered. *Id.*

On October 14, 2017, petitioner presented to the emergency department of the northeast location of the Carolina HealthCare System for a right hip injury. Pet. Ex. 2 at 204. Petitioner reported that he was having difficulty using his knee scooter, which caused him to fall and he struck his right buttock and hip. *Id.* Petitioner had moderate pain with internal rotation of his right hip and none with external rotation. *Id.* at 205. Under "neurological" it was recorded that he had "no neurological deficits observed." *Id.* Petitioner had an X-ray of his right hip, which did not reveal any broken bones. Petitioner was discharged to home.

Later the same day, October 14, 2017, petitioner returned to the emergency department at the CHS Northeast for "right sided weakness." Pet. Ex. 2 at 252. The "History of Present Illness" states, "The patient went to his PCP on Tuesday and received a flu vaccine. He immediately felt right neck pain and shoulder pain after the vaccination. The shoulder pain increased and the patient could not lift his right arm on Thursday. On Friday, he was in the parking lot and suddenly his right leg gave out and he fell on his right buttock and right leg." *Id.* Additionally, the HPI provides, "…he noticed the right side of his mouth drooping and had difficulty eating his dinner with food falling out of his mouth." *Id.* Under neurologic review, it was recorded that petitioner had a "right side facial droop." *Id.* at 253. Under the "Impression and Plan," it stated, "Petitioner received a flu vaccine on Tuesday and symptoms progressed after that. CT does not show an acute process… Guillain Barre is possible differential, but unlikely as his weakness is not symmetric and ascending in nature." *Id.* at 254.

Petitioner's treating physician and attending, Dr. Levy wrote an addendum to petitioner's record. Pet. Ex. 2 at 256. Dr. Levy wrote that "approximately four days ago [petitioner] developed severe right arm and neck pain. He also developed right leg weakness around that time. He initially was evaluated at urgent care and was felt to likely have a rotator cuff injury at which time an MRI was scheduled. Subsequently, he started having increasing weakness in his right leg and yesterday fell sustaining a

contusion to his right hip.  He was seen at the emergency department and I have reviewed those records, x-rays were unremarkable.  Earlier today, he noticed difficulty with speech, facial droop, difficulty swallowing, and eye watering…..He did have a flu shot four days ago." *Id.*  Petitioner's right lower extremity exam revealed that he had 4/5 proximal and distal strength and normal reflexes.  It is unclear if his left side was tested for reflexes.  *Id.* at 256.  Petitioner was admitted for further evaluation, including an MRI of his shoulder.

Petitioner had a neurology consult on Sunday October 15, 2017.  Pet. Ex. 2 at 303-307. Petitioner reported that he had received a flu shot in his left arm on Tuesday.  *Id.*  He reported that by Tuesday afternoon, his *right* arm had developed severe pain and he went to an orthopedist "for a questionable rotator cuff injury to the right arm."  *Id.*  Petitioner also reported that, "… on Thursday, [he] was walking outside and fell stating that he had right leg weakness, he does have abrasions to the right side of his right leg."  *Id.*  Then the record provides, "He continued to have severe pain of his arm, weakness of his right leg and then on Saturday developed difficulty while he was eating, stating that he was drooling from the right side of his mouth."  *Id.*  The physical exam revealed absent reflexes in "upper and lower extremities," and he had normal strength on his left upper extremity, but reduced strength in his right upper extremity.  *Id.* at 307.  Petitioner had reduced strength bilaterally in his lower extremities.  *Id.*  The "Impression and Plan" stated, "This is a 55-year-old male with progressive weakness of his right side initially starting with his arm into his right leg and now with right facial droop."  *Id.* at 311. A brain MRI and CT scan were ordered, along with a lumbar puncture.

Additionally, petitioner had an MRI of his right shoulder on October 15, 2017, which revealed a "focal full-thickness tear of the anterior fibers infraspinatus which extends to the articular surface of the supraspinatus with superimposed moderate tendinosis."  Pet. Ex. 2 at 410.

On October 16, 2017, petitioner underwent a lumbar spine puncture.  Pet. Ex. 2 at 313.  His CSF protein level was 345.  *Id.* at 316.  A brain MRI taken on October 17, 2017 showed "subtle enhancement involving the bilateral intracranial and labyrinthine segments of the facial nerve which can be seen in [the] setting of Bell's palsy.  Enhancement is also seen involving the geniculate, tympanic and mastoid segments of the bilateral facial nerves which can be normal, but also can be seen in setting of Bell's palsy."  *Id.* at 315.

Dr. George Khouri took over petitioner's care on October 16, 2017 and noted that petitioner's returned lumbar puncture showed an elevated protein of 345 without elevated white blood cells.  Pet. Ex. 2 at 410.  His impression was, "Unclear pathology leading to his progressive complaints.  He has developed a bilateral Bell's palsy today from unilateral yesterday.  The etiology could be broad to include a post-infectious inflammatory syndrome….to autoimmune such as the Miller Fisher variant of GBS."  *Id.*  He ordered that petitioner be started on IVIG treatment for five days.  *Id.*

On October 18, 2017, petitioner underwent an EMG/Nerve Conduction Study ("NCS") test.  Pet. Ex. 2 at 429.  Under "Indication for Study," it was recorded that petitioner had 8 days of progressive weakness on the right greater than the left involving the leg, arm and face.  *Id.*  Petitioner's sensory nerve conductions of the right leg revealed absent responses of the sural and superficial peroneal nerves.  Sensory response in the right arm was absent in the median and ulnar nerves and the right radial conduction was reduced in amplitude and prolonged in latency.  *Id.* at 428.  Additionally, the motor

nerve conduction of the right leg "reveal the peroneal response from the EDB[3] is absent. The right tibial response from the AH are absent. The peroneal response from the tibialis anterior is reduced in amplitude, prolonged in distal latency and reduced in conduction velocity." *Id.* The impression of the study was, "Limited electrodiagnostic study of the right leg and right arm and right face with limited nerve conductions of the left arm and left face reveals findings consistent with a peripheral polyneuropathy with both axon loss and demyelinating features. It is extremely severe in degree electrically. Active denervation is seen. The study is consistent with acute inflammatory demyelinating polyneuropathy if clinically appropriate." *Id.*

Petitioner's primary care physician, Dr. Levy, examined the petitioner in the hospital on October 20, 2017 and wrote that he agreed with the plan of care outlined by Dr. Corbello. Pet. Ex. 2 at 370. Additionally, Dr. Levy wrote that petitioner's MRI of the right shoulder showed a full thickness tear in the infraspinatus tendon *Id.* Further, Dr. Levy noted that petitioner was "continuing IVIG per neurology for suspected AIDP…most likely from vaccine reaction. Now on 4/5 day of IVIG." *Id.*

Petitioner was discharged on October 24, 2017 after five days of IVIG to a rehabilitation facility. Pet. Ex. 2 at 248. His discharge diagnosis was "Guillain-Barré." *Id.* However, petitioner was readmitted to the CHS Northeast on October 28, 2017 for double vision. Pet. Ex. 2 at 1307. Under the "History of Present Illness" on October 28, 2017, it stated, "The patient is here admitted earlier this month for bilateral facial weakness and right-sided weakness that was felt to be due to Guillain-Barré type phenomenon. He had an EMG and nerve conduction study that confirmed this. He also had an MRI of the brain that confirmed bilateral facial nerve inflammation. He [has a] history with 5 days of IVIG and had a decent result, with improvement in speech and swallowing abilities. He did not recover his right arm strength so as this was the first symptom he did have." *Id.* The physical exam showed that his reflexes were diminished bilaterally. *Id.* at 1308. A repeat brain MRI was taken which showed persistent enhancement of the facial nerve, which were considered "consistent with potential sequelae of his Guillain-Barre variant." *Id.* at 1259.

Petitioner had a neurology appointment with Dr. Russ Bodner on November 22, 2017. Pet. Ex. 7 at 3. Dr. Bodner noted that he had performed the EMG/NCS on the petitioner in the hospital. *Id.* Dr. Bodner recounted petitioner's history and wrote:

> The patient had been seen by his primary care physician on 10/10/2017 for otitis media and received antibiotics. He reportedly also had the flu vaccine given. He was apparently initially felt to possibly be having a left sided stroke. He was seen by neurology initially on October 15, 2017. On the following day, he was noted to have bilateral facial weakness….He had a lumbar puncture that showed a protein of 345. [He] was noted to have left-sided weakness around this time…He was started on intravenous gamma globulin given 2g/kg over 5 days. He is currently at Liberty Commons obtaining rehabilitation...Prior to all of this he did have a diabetic foot ulcer on the left for which he was in a boot and using a knee scooter for about 18 months.

*Id.* at 4. After a physical exam, Dr. Bodner wrote his assessment of petitioner as the following:

---

[3] EDB is the extensor digitorum brevis. AH is the abductor halluces are muscles in the foot.

Status post-acute inflammatory demyelinating polyneuropathy.  I reviewed the situation at length with the patient and his family.  His onset seems relatively too soon after receiving the flu vaccine to be able to clearly attribute it to that.  He is having slow improvement.

*Id.* at 5.

Petitioner had a follow-up appointment with Dr. Bodner on March 7, 2018.  Pet. Ex. 7 at 25-27.  At this appointment, Dr. Bodner noted that petitioner had substantial improvement, but he still had ongoing weakness "predominantly in the proximal right arm as well as some weakness proximally and distally in the right leg."  *Id.* at 27.  Dr. Bodner stated, "Obviously I am extremely pleased with the improvement that [petitioner] has had and expect that he should have ongoing further improvement."  *Id.*

On May 3, 2018, petitioner had an appointment with his primary care physician, Dr. Levy.  Pet. Ex. 1 at 268.  Dr. Levy wrote that, "The patient is a 55-year-old with a history of poorly controlled type 2 diabetes with neuropathy, obstructive sleep apnea, polycythemia, borderline hypogonadism, hypertension, CIDP with right facial weakness since October 2017 following a viral illness and flu vaccine, and hyperlipidemia who comes in today for a follow-up."  *Id.*  Petitioner reported that his right arm is about 60% improved, and has a mild right facial weakness and excellent recovery of the right leg, but he was struggling with left foot ulcers.  *Id.*

Petitioner returned to neurologist, Dr. Bodner, on October 11, 2018.  Pet. Ex. 7 at 68.  Petitioner reported that he was having "significant improvement" since March, with the only area still causing problems was the right shoulder.  *Id.*  Petitioner reported that his facial strength was normal, but if he gets tired, he might have a "little slurring of his words."  *Id.*  Dr. Bodner assessed petitioner with, "Status post-acute inflammatory demyelinating polyneuropathy.  The patient has had ongoing substantial improvement.  In fact, the only area of weakness he is concerned about is the right shoulder.  On exam he is quite weak at the right shoulder and has slight weakness at the right ankle dorsiflexor."  *Id.* at 71.  Dr. Bodner recommended that petitioner have a follow-up MRI of his right shoulder and a limited EMG of his right upper extremity to determine if the weakness is neurogenic or orthopedic.  *Id.*

The result from the limited EMG/NCS showed that petitioner had "abnormalities in the right arm consistent with an axon loss lesion to the right deltoid, infraspinatus and supraspinatus that is extremely severe degree in electrically."  Pet. Ex. 7 at 90.  Additionally, petitioner had slowing of the left axillary conduction.  *Id.*

Petitioner had a follow-up appointment with Dr. Bodner on August 15, 2019.  Pet. Ex. 7 at 4.  Petitioner reported that his right shoulder mobility improved.  *Id.*  Petitioner had mild residual weakness in his right shoulder, but he was able to raise his right arm over his head.  *Id.* at 5. Dr. Bodner assessed petitioner with "status post-acute inflammatory demyelinating polyneuropathy 10/2017.  He has had further improvement in his strength," and a "tremor."  *Id.* at 6.

### b.  Statement by neurologist, Dr. Bodner

On November 24, 2020, Dr. Bodner executed a letter that described the petitioner's diagnosis, history of medical care, and the timing of the onset of petitioner's symptoms.  Pet. Ex. 18.  Dr. Bodner stated that he had performed the EMG study on the petitioner October 18, 2017, at the request of the neurology team at Atrium Health Cabarrus.  *Id.*  Dr. Bodner stated that, "The patient's clinical presentation was complex but felt to potentially represent acute inflammatory demyelinating

polyneuropathy (GBS). The EMG I performed on October 18, 2017 along with other data revealed findings consistent with acute inflammatory demyelinating polyneuropathy. The patient remained hospitalized during further evaluation and treatment at Atrium Health Cabarrus from October 15, 2017 to October 24, 2017.

Dr. Bodner stated that "prior to the onset of symptoms, [petitioner] was seen by his primary care physician Dr. Robert Levy on October 10, 2017 for otitis media and was prescribed antibiotics and also received the influenza vaccine." *Id.* Three days later, on October 13, 2017, [petitioner] noted weakness in the right arm and subsequently the right face and leg. He was seen in the emergency room at Atrium Health Cabarrus on October 14, 2017 after a fall off his knee scooter. He was evaluated and was discharged from the emergency room but returned later that day for increased numbness, tingling, and weakness of his right arm and left face." *Id.*

Dr. Bodner stated that he reviewed the petition, petitioner's affidavit, and the medical records for his care to formulate the letter. Dr. Bodner wrote, "[Petitioner] outlined in his affidavit and conveyed to me that his symptoms began approximately 3 days following the influenza vaccination that he had received. This is an appropriate timeframe for the onset of GBS symptoms attributable to the influenza vaccination." *Id.*

Dr. Bodner also stated that petitioner's diagnosis was "conclusively confirmed as GBS," as evidenced by the EMG performed on October 18, 2017, even though he initially presented with right-sided weakness rather than symmetric and classic ascending symptoms. *Id.* at 2.

### c. Petitioner's affidavit and testimony

Petitioner submitted an affidavit on February 8, 2019 and he testified at the fact hearing which was held on March 23, 2023.

In his affidavit, petitioner stated, "Prior to the flu vaccination, on Friday, October 6, 2017, at the Central Davidson Football game, I was coming out of the bathroom and my scooter wheel hit a rock and jerked the handle and my shoulder." Pet. Aff. at ¶ 3. He stated that, "I hurt my right shoulder as a result of that jarring incident." Petitioner stated that he had a boot on his left foot because of a diabetic ulcer. *Id.* During the hearing, petitioner testified that he had broken his left foot in 2016 and the cast created an ulcer on his foot, which his diabetes created a process of slow healing. Transcript ("Tr.") 6. It was because of the boot on his foot, which necessitated a knee scooter. *Id.* at 7. Petitioner described the scooter as having four wheels, with the front wheels being wider than the back wheels, with a pad in the middle that his left knee would fit on and he would propel himself with his right leg. *Id.* He stated that at the time his scooter had plastic wheels, which made it difficult to maneuver, as there was "no flex as you travel over a pebble or a piece of a tree limb or anything that may be lying in your pathway." *Id.* at 7-8.

Petitioner testified that on October 6, 2017, he went with a friend to watch his son play in a football game in the neighboring county. Tr. 8. He stated that the bleachers and parking lot were "convenient in the fact that their parking lot came right up to a concrete pad that allowed you to go over to the bleachers or concession stand." *Id.* Petitioner testified that he and his friend were seated in the top level of bleachers, making is easier for him to pull the scooter up to the railing and then step around down into the bleachers. *Id.* He explained that the bleachers were built into the side of a hill so that the

top row of the bleachers was level with the parking lot and the football field was lower than the parking lot and concrete pad. Tr. 80-87. During halftime of the game, petitioner got up and used his knee scooter to travel behind the concession stand to the bathroom. *Id.* at 9. Petitioner stated that on his way back from the bathroom, "I was strolling along at a more than moderate rate of speed across that concrete pad and my front wheel on my scooter hit a rock." *Id.* at 9. This caused a "very deliberate and instantaneous twisting of [the] handlebars because obviously the wheel stopped right there and it caused the handlebars to twist in a frantic way and immediately I had pain in my right shoulder from that twisting motion." *Id.* Petitioner explained that he did not get "knocked off" the scooter at the time of the incident, but it sent a wave down my arm and hands. *Id.* at 10. Petitioner also testified that when he hit the rock, the scooter twisted to the left, pulling his right arm forward. *Id.* When petitioner got back to the bleachers, he told his friend about the incident and also took some ibuprofen. *Id.* at 11.

On October 10, 2017, a Tuesday, petitioner called Dr. Levy's office to get an appointment because he was having sinus congestion and drainage and he thought it was the onset of an ear infection. Tr. 14. Petitioner explained that he had some left-over Amoxicillin from a previous infection and started taking those prior to the appointment. *Id.* Petitioner also testified that he discussed his right shoulder with Dr. Levy. *Id.* He also stated that Dr. Levy ordered another prescription of Amoxicillin, but petitioner could not remember if he had ever gotten the prescription filled. *Id.* at 15.

In his affidavit, petitioner stated on October 11, 2017, he went to Burgess Chiropractic Clinic "because my right shoulder hurt from the jarring incident six days earlier." Pet. Aff. at ¶ 4. Petitioner testified that he went to the chiropractor who was "more of a massage chiropractor" and that he thought the chiropractor could "work the muscles" of his right shoulder. Tr. 17. Petitioner explained that the chiropractor used an electric stimulator on his shoulder and that the chiropractor expressed concern that something had been torn in the right shoulder. *Id.* When asked why the note states that the onset of petitioner's right shoulder pain was written down as "October 10, 2017," petitioner stated that "the date should have been corresponding with the football game." *Id.* at 18. Petitioner also testified that he went back on the following day, October 12, 2017, for a follow-up, which is why the note indicates that petitioner had "pain and limited arm motion in the right shoulder and arm today, and the neck is somewhat better." *Id.* at 19. Petitioner stated that the record provided an accurate description of how his arm was feeling on October 12, 2017. *Id.*

Petitioner was asked if he was experiencing any other symptoms, such as weakness, numbness or tingling in his right arm, aside from the pain, and he testified, "No, it was pretty well confined [to the pain]." Tr. 19. He stated that over the weekend, after Friday, October 6, 2017, he used a heating pad and iced it. *Id.* at 20.

Later that day, on October 12, 2017, petitioner explained he had an appointment at OrthoCarolina Urgent Care, which had been set up by his friend Barbara. Tr. 21; Pet. Aff. at ¶ 4. Petitioner testified that he took the first available appointment, which was with a physician assistant, Steve Russo. Tr. 21. Petitioner testified that the description of the "History of Present Illness," provided in the medical record from this appointment was accurate. Tr. 23; *see* Pet. Ex. 4. Additionally, he testified that the description that "the pain and discomfort has progressively worsened to the point that he can no longer lift his arm up," was also accurate. *Id.* Petitioner testified that he could not raise his arm up because his arm was painful, not because of any weakness. Tr. 24. Petitioner stated that Physician Assistant Russo's opinion was "a very high chance that I had a torn rotator cuff," which was also reflected in the record from that

date. Tr. 23.  Petitioner also testified that at this appointment he did not have any numbness or tingling in his right arm.  Tr. 25.

Petitioner stated that on Friday, October 13, 2017, a week after the football game, he went to cryogenic therapy at the "Restore Hyper Wellness+Cryotherapy" in Charlotte.  Pet. Aff. at ¶ 5; Tr. 28.  He explained that he had received "a couple of gift certificates from a friend to try out a cryogenic institute."  Tr. 28.  Petitioner testified that he had previously had cryogenic therapy from foot to waist int the past and wanted to try it out on his right shoulder.  *Id.*  Petitioner stated that he went to Charlotte with his father on October 13, 2017.  Tr. 29.

Petitioner stated that in order to get to the cyrogenic center he had to "walk across a pretty vast parking lot."  Tr. 30.  He stated that when he began to walk into the chamber he "felt some dizziness," and that he had almost "lost dexterity," when trying to get into the cyrogenic chamber.  *Id.*  Petitioner testified that his father had to help him into the chamber.  *Id.*  After the process, which took about five minutes, petitioner stated that he was unable to put his shoes on and that his 87-year old father had to assist him.  *Id.*  Petitioner stated that he could not put his shoes on because he felt as if he had a loss of balance.  Tr. 31.  After the appointment, he and his father got back into the car and drove to a restaurant.  Tr. 33.  At the restaurant parking lot, petitioner stated that his father had retrieved the scooter from the trunk of the car and put it next to the door so the petitioner could easily use it.  Tr. 33-34.  He testified that, as he went to walk over to the scooter, he fell backwards, down into the gutter.  Tr. 34.  Petitioner testified that he had rolled and "most of the impact was on his right side."  *Id.*  He stated that the fall "took a lot of the skin and he had very heavy abrasions on my right leg and…some on [his] right hip."  *Id.*  Petitioner stated that once he was able to regain his composure and move to a place where there was less of an incline, he and his father were able to move into the restaurant for lunch.  Tr. 34. Petitioner testified that Friday, October 13, 2017 was the first day he experienced any dizziness or weakness.  Tr. 35.  He described it as vertigo and "overall general body weakness."  Tr. 36.

The following day, Saturday, October 14, 2017, petitioner testified that he began his morning by having some difficulty standing up out of bed.  Tr. 37.  He stated that he began to feel numbness and tingling in his face and he thought he was having a stroke.  Tr. 38.  Petitioner stated that he fell off his knee scooter at home that day.  Pet. Aff. at ¶ 6.  In his affidavit, petitioner explained that he had diminished control over his right side and that he could not control his right arm and leg, which caused him to fall again onto his right side.  *Id.*  His fall prompted his family to call an ambulance and take him to the emergency department.  Tr. 40.

Petitioner testified that his wife was with him in the emergency department on October 14, 2017.  Tr. 42.  He stated that he was never examined in a room, but in the hallway the entire time.  Tr. 43.  He described the emergency department as a "brush-off," and he was discharged to home.  Tr. 43.  When he returned home, petitioner stated that the remainder of the day was a "miserable day," and that he had "bilateral radiating pain," and stated that his skin was "hurt."  Tr. 43.  Petitioner stated that the pain was in his lower extremities and in his face.  Tr. 44.  He described it as "numbness" and "tingling."  *Id.*  As the day progressed, petitioner stated that his family "pointed out pretty quick that my speech was beginning to slur."  Tr. 44.

Petitioner stated that his friend Barbara and her husband brought him a plate from the Grace Lutheran Fish Fry.  Tr. 45; Pet. Aff. at ¶ 6.  He testified that when he went to peel the skin off the bottom of the fish, he "didn't have the ability to even hold the fork and knife to be able to scrape the bottom

off." Tr. 45. Petitioner stated that his friends pulled the fish into pieces for him. *Id.* Additionally, when he went to chew the fish, "it would start falling right back out into the plate." Tr. 45; Pet. Aff. at ¶ 6. He stated that he tried to eat different things and even drink through a straw, but that the liquid "ran back out of his mouth." Tr. 45.

Petitioner testified that his family called the emergency services again and he was taken back to the emergency department. Tr. 46. Petitioner testified that during his second trip to the emergency department, his wife was giving the information to the doctors. Tr. 65. When petitioner was asked if the record, which stated, "He immediately felt right neck pain and shoulder pain after the vaccine," was accurate, petitioner testified that he may have felt pain at the injection site, but "that would be the only thing," and that the record was not accurate. Tr. 66. He also stated that, "that's not the information that I would have given them," and that his wife "could have very well given [the doctor] that information." Tr. 66-67.

Petitioner also testified that the description recorded in the "History of Present Illness," from a note by Dr. Mak on October 15, 2017, which indicated that he began to experience right leg weakness four days prior to the hospital admission was incorrect. Tr. 69. The "History of Present Illness," from that record states, "Patient is a 55 year-old….who approximately four days ago developed severe right arm and neck pain. He also developed right leg weakness around the same time." Pet. Ex. 2 at 256. Petitioner testified that four days prior to his admission, October 11, 2017, is when he went to the chiropractor for his shoulder pain and that it was not until October 13, 2017 when his leg weakness began. Tr. 70-71. He stated, "I did not have right leg pain on the 11th…I didn't have any [of the lower extremity pain] until sitting in the lobby at the cryogenics." Tr. 71.

During the hearing, petitioner was also asked to review the "History of Present Illness" section from the first neurology consult on October 15, 2017. Tr. 74. The relevant portion of the record states, "Patient states he presented to his primary care physician's office on Tuesday with complaint of left ear pain and at that time was diagnosed with ear infection and started on amoxicillin. He was also given his yearly flu shot in his left arm that same day. He states by Tuesday afternoon he had developed severe pain in his right shoulder as well as right arm weakness." Pet. Ex. 2 at 304. Petitioner testified that the reference to his right shoulder pain and weakness was because of his scooter injury, which was the underlying reason for the chiropractor and orthopedic appointments. Tr. 76. He explained that the condition of his right arm and shoulder had not changed from the football game, on October 6, 2017, and that it did not get worse when he got the flu shot. Tr. 77. Petitioner agreed that his right shoulder symptoms remained static from the time he injured his shoulder on October 6, 2017, at the football game through the course of his GBS diagnosis. Tr. 78. Petitioner also explained that he had received the flu vaccine in his left shoulder and that he did not feel any right neck or shoulder pain immediately after the vaccination. Tr. 79.

### d. Statement of Mr. Tyler Karriker

Petitioner submitted a statement from Mr. Tyler Karriker, the son of the petitioner. Pet. Ex. 37. Mr. Tyler Karriker stated that he "regularly attended [his] brother's football games" in the fall of 2017. *Id.* at ¶ 3. He stated that he also attended the football game on Friday, October 6, 2017. *Id.* at ¶ 4. Mr. Tyler Karriker stated that his father was using a knee scooter on that date and when the petitioner "went to the bathroom, [the scooter] hit a rock, which caused an injury to his right shoulder." *Id.*

11

Mr. Tyler Karriker also stated on Saturday, October 14, 2017, he observed that food was falling from the petitioner's mouth and he appeared to be experiencing stroke-like symptoms. *Id.* at ¶ 5. Further, he stated that petitioner was taken to the hospital by EMS earlier that day after a fall and a stroke was ruled out. *Id.* When petitioner returned to the hospital, he was diagnosed with Guillain-Barre Syndrome ("GBS"). *Id.* at ¶ 5.

### e.   Statement of Mr. Scotland Karriker

Petitioner's youngest son, Mr. Scotland Karriker, executed an affidavit on March 13, 2023. Pet. Ex. 38. Mr. Scotland Karriker stated that his father regularly attended his football games and "it was unusual for him to miss a game." *Id.* at ¶ 2. He stated that on Friday, October 13, 2017, he had a football game and looked for his father in the stands, however, his father was not there. *Id.* at ¶ 3. Mr. Scotland Karriker stated that he called his father to see if he was coming, but his father told him that he was not going to make it because he was not feeling well. *Id.*

The following day, October 14, 2017, Mr. Scotland Karriker stated that his father appeared "off" and was taken to the hospital by EMS, but he was sent home. *Id.* at ¶ 4. He stated that his father "struggled to eat later that day, with food and drink falling out of his mouth. He was taken back to the hospital where he was diagnosed with Guillain-Barré syndrome." *Id.* Mr. Scotland Karriker stated, "To my knowledge, my father's symptoms of GBS began on October 13, 2017." *Id.* at ¶ 5.

### f.   Statement of Ms. Crystal Fowler

Petitioner's ex-spouse, Ms. Crystal Fowler executed an affidavit on March 15, 2023. Pet. Ex. 39. She stated that on October 10, 2017, the petitioner went to his doctor due to symptoms of an ear infection and received a flu shot. *Id.* at ¶ 3. She stated that on Friday, October 13, 2017, petitioner and his father had gone to Applebee's and "came home talking about having fallen." *Id.* at ¶ 4.

Ms. Fowler stated that while she was out running, she received a message from her son saying that the petitioner had fallen and could not get up. *Id.* at ¶ 5. She stated that an ambulance was called, he was taken to the hospital and released later. *Id.* That evening, the church fish fry food was brought to the house by a friend and she recalled "hearing Coyt mumbling and I went to check on him and he appeared to be having a stroke." *Id.* She stated that, "We went back to the hospital where a stroke was ruled out and he was diagnosed with GBS." *Id.*

## III.   Standard of Adjudication

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Curcuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at

*20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs*., 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV.     Parties' contentions

In petitioner's response to the Chief Special Master's Order to Show Cause, petitioner stated that three days after the flu vaccination, on October 13, 2017 he began to experience weakness, the first symptom of his later diagnosed GBS. Pet. Response at 3, 8.

Petitioner stated that the respondent was relying on a recording of petitioner's "History of Present Illness," by a medical student which failed to document petitioner's right shoulder injury from the scooter incident on October 6, 2017 and that petitioner received the flu shot in his *left* shoulder, not his right shoulder. Pet. Response at 9 (original emphasis). Petitioner argued that "It defies logic that petitioner would have immediate *right* shoulder pain from an injection in the *left* deltoid." *Id.*

Additionally, petitioner asserted that the reference to the right shoulder pain was from the shoulder injury he suffered on Friday, October 6, 2017, prior to the flu vaccination on Tuesday, October 10, 2017. *Id.* Petitioner stated that by the time he was hospitalized on October 15, 2017 for the symptoms related to the GBS diagnosis, he had already received both chiropractic and orthopedic treatment. *Id.* Further, petitioner argues that his treating providers "conflate the shoulder pain symptoms with petitioner's overall clinical picture as he also complained about the pain in his right shoulder in addition to weakness and Bell's palsy." *Id.* He argued that the "shoulder pain symptoms

were separate, as the vaccination in the left deltoid would not have caused a torn rotator cuff in the right shoulder," and that his "pre-existing right shoulder pain was not indicative of the onset of his GBS." *Id.*

Petitioner asserts that his symptoms of the GBS, began on Friday, October 13, 2017, three days post-vaccination. *Id.* at 10. Petitioner states that his initial symptom of the GBS was weakness, which led him to falling while going into the restaurant on Friday, October 13, 2017 and then caused him to fall the following day, October 14, 2017 at home. Petitioner argues that the onset of his weakness, being three days post-vaccination qualifies his case as an "on-Table claim." *Id.*

Respondent argues that petitioner's symptoms of "his alleged GBS began the same day as his vaccination on October 10, 2017. Resp. Reply at 1. Respondent asserts that the chiropractor appointment on October 11, 2017 states that petitioner complained of right shoulder pain since October 10, 2017, which would put onset the day of vaccination. *Id.* at 2.

Additionally, respondent asserts that petitioner's hospital records document his right leg weakness, as well as right arm and neck pain developed the same time. *Id.* at 2. Respondent asserts that the HPI of petitioner recorded by neurology, which states, "[h]e was also given his yearly flu shot in his left arm that same day. He states by Tuesday afternoon he had developed severe pain in his right shoulder as well as right arm weakness," as evidence that petitioner's symptoms began the same day as the vaccination.

Respondent argues that the medical records are "very clear that petitioner's symptoms of alleged GBS began on October 10, 2017," and that petitioner's affidavit is the only evidence that petitioner has submitted to contradict the medical records. *Id.* at 2. Respondent asserts that the medical records are to be presumed to be accurate and complete. *Id.*

**V.      Discussion and conclusion**

Based on a review of the evidence submitted, which includes petitioner's medical records, his affidavit, the affidavits of his family, and petitioner's testimony, I find that petitioner has established that the initial onset of his GBS occurred on October 13, 2017, three days after petitioner received the flu vaccine.

Importantly, the record as a whole demonstrates that petitioner experienced a right shoulder injury prior to receiving his influenza vaccination on October 10, 2017. Petitioner argued that the medical providers in the hospital when he was admitted on October 15, 2017, conflated his right shoulder injury, which pre-dated the vaccination, to the onset of his facial and leg weakness. I agree.

The record establishes that petitioner was using a kneeling scooter at the time of his right shoulder injury. *See* Pet. Ex. 4 at 2. On Friday, October 6, 2017, petitioner attended his youngest son's football game, which is where he injured his right shoulder. Petitioner credibly testified that while he was going to the bathroom during half-time, his kneeling scooter hit a rock, which caused his right arm to pull forward. Tr. 9; Pet. Aff. at ¶ 3. Petitioner's older son, Mr. Tyler Karriker, confirmed that his father was at the football game on Friday, October 6, 2017 and that he was aware that his father hurt his shoulder that evening. *See* Pet. Ex. 37 at ¶ 4.

14

Petitioner testified that he had to wait until the following week to get an appointment for his right shoulder at the OrthoCarolina Urgent Care Center. Tr. 22. On Thursday, October, 12, 2017, petitioner explained what had happened at the football game the preceding Friday evening. Pet. Ex. 4 at 2. The record states, "Patient states he was riding on his scooter when he hit a rock this past Friday night and the scooter jerked his right shoulder and immediately felt pain and discomfort." *Id.* This record corroborates petitioner's testimony and statements made in the affidavit that he had an incident on the kneeling scooter which caused him to injure his right shoulder.

Further, while petitioner was in the emergency department the first time on October 14, 2017, the kneeling scooter incident was recorded in the History of Present Illness. The record states, "This is a 55-year-old male who comes to the ER with a right hip injury. Patient reports a recent history of other medical problems including chronic left foot ulcer that requires him to use a knee scooter and a *recent injury to the right shoulder. Patient has been evaluated by orthopedics for the shoulder injury and has an MRI scheduled."* Pet. Ex. 2 at 204 (emphasis added). Petitioner's MRI of his right shoulder during his hospitalization revealed a "focal full-thickness tear of the anterior fibers [of the] infraspinatus which extends to the articular surface of the supraspinatus with superimposed moderate tendinosis." Pet Ex. 2 at 795. Mechanically, the sudden jerking forward of his right arm and shoulder when the left side of the scooter struck the rock would be consistent with the demonstrated tear of the infraspinatus tendon, located in the back of the shoulder joint.

Medical records that are themselves inconsistent, should be accorded less deference than those which are internally consistent. *Lowrie,* at *19. The medical records respondent cites in support of onset being on the day of the vaccination includes multiple errors and are inconsistent with other medical records submitted in this case. For example, the HPI recorded during the neurology consult on October 15, 2017, states, "On Thursday evening he presented to orthopedics urgent care [for] this right leg and right arm difficulty." Pet. Ex. 2 at 304. However, the record from OrthoCarolina from October 12, 2017 does not mention any right leg issues and petitioner did not report any at that appointment. Further, the same neurology consult record states that, "….on Thursday patient was walking outside and fell stating that he had right leg weakness, he does have abrasions to the right side of his right leg." *Id.* Additionally, petitioner testified that he did not fall until Friday, October 13, 2017. Statements from petitioner's two sons and his former spouse also corroborate petitioner's testimony that he fell on Friday, October 13, 2017, not Thursday, October 12, 2017. *See* Pet. Ex. 39 at ¶ 4. Finally, the first-time petitioner presented to the emergency room was Saturday, October 14, 2017. That record documents that he fell on Friday, October 13, 2017. The relevant record provides, "This is a 55-year-old male who comes to the ER with a right hip injury….He reports difficulty using the knee scooter due to the right shoulder injury and states that he was [on] uneven surface yesterday and fell off of it, struck his buttock and right hip." Pet. Ex. 2 at 204. This is consistent with the history of the fall at the restaurant on October 13.

Petitioner is also correct that the HPI taken by the medical student in the early morning of October 15, 2017 incorrectly associates the flu vaccination with the onset of petitioner's right shoulder pain. It is well documented that petitioner received the flu vaccination in his *left* deltoid. *See* Pet. Ex. 1 at 224. The medical student wrote, "he immediately felt right neck pain and shoulder pain after the vaccine." Pet. Ex. 2 at 252. It is unclear how the vaccine administered on the left side could cause immediate pain in the opposite shoulder and neck.

While respondent correctly observes that some of petitioner's medical records put the onset of his right shoulder pain and right leg weakness at the same time, the record overall supports the finding that petitioner's right shoulder pain pre-dated the flu vaccination and that the onset of weakness began on Friday, October 13, 2017.

Petitioner stated in his affidavit that on Friday, October 13, 2017, he went to Charlotte with his father to use a gift card for a cyrogenic therapy session. Pet. Aff. at ¶ 5. He explained that his father needed to help him into the tank to keep his balance and then help him put on his shoes afterwards because he had felt unsteady. *Id.*; Tr. 30. After the cyrogenic therapy session, petitioner and his father went to Applebee's for lunch. *Id.*; Tr. 33. Petitioner testified that he fell onto his right side when trying to get out of the car and onto his kneeling scooter. *Id.* Petitioner's recollection of the events on Friday, October 13, 2017 were corroborated by Ms. Crystal Fowler's statements in her affidavit, where she stated, "On Friday, October 13th, [petitioner] had gone to Applebee's with his dad and came home talking about having fallen." Pet. Ex. 39 at ¶5. Further, petitioner's medical records support that his leg weakness began on Friday, October 13, 2017.

Petitioner's first emergency department visit on October 14, 2017, clearly documents that he fell on Friday, October 13, 2017. *See* Pet. Ex. 2 at 204. The HPI taken by the medical student in the early morning of October 15, 2017 states, "On Friday, he was in the parking lot and suddenly his right leg gave out and he fell on his right buttock and right leg." *Id.* at 252. The physical therapy evaluation performed on petitioner on October 15, 2017 states, "Patient s/p fall on Friday, 10/13/2017 resulting in abrasions to R distal LE." *Id.* at 1161. Finally, when petitioner was treated at OrthoCarolina on Thursday, October 12, 2017, there was no indication that he was experiencing leg weakness, only that he had a right shoulder injury that occurred the week prior to the appointment. *See* Pet. Ex. 4 at 2.

Petitioner has provided credible, cogent and clear testimony that explains when his right shoulder pain began, as well as when his right leg weakness and other symptoms consistent with GBS began. Further, petitioner's testimony does not contradict the medical records, but instead provides clarity to records that include internal inconsistencies. Thus, petitioner has established that the weakness he experienced, the first symptom of his GBS, began on Friday, October 13, 2017, three days after his flu vaccination on October 10, 2017.

The following is **ORDERED**:

**Within thirty (30) days, by Friday, May 26, 2023, respondent shall file a status report indicating how he intends to proceed in this matter.**

**IT IS SO ORDERED.**

**s/Thomas L. Gowen**
Thomas L. Gowen
Special Master